QESTEC, INC., William P. Moulin, and Joseph W. Lawrence, Plaintiffs,

v.

Michael KRUMMENACKER, Defendant.

No. CIV.A.00–30107–NMG.

United States District Court, D. Massachusetts.

Aug. 9, 2005.

Kurt L. Binder, Morrison, Mahoney & Miller, Yarmouthport, MA, for Qestec, Inc., Joseph J. Lawrence, William P. Moulin, Plaintiffs.

Burton Chandler, Seder & Chandler, Worcester, MA, for Qestec, Inc., Plaintiff.

Louis M. Ciavarra, Bowditch & Dewey, LLP, Worcester, MA, for Michael J. Krummenacker, Defendant, Pro Se.

James J. Duane, III, Taylor, Duane, Barton & Gilman, Boston, MA, for Joseph J. Lawrence, William P. Moulin, Plaintiffs.

Lawrence Gingrow, Taylor, Duane, Barton & Gilman, Boston, MA, for Joseph J. Lawrence, William P. Moulin, Plaintiffs.

Matthew E. Mitchell, Keegan, Werlin & Pabian, LLP, Boston, MA, for Michael J. Krummenacker, Defendant, Pro Se.

Robert S. White, Bourgeois, Dresser & White, Worcester, MA, for Joseph J. Lawrence, William P. Moulin, Plaintiffs.

## MEMORANDUM & ORDER

GORTON, District Judge.

On July 18, 2005, after five years of litigation, the parties filed a letter with the Court stating that they had settled most of their dispute but that several issues remained unresolved. The parties requested that the Court set a briefing schedule and hold a hearing to resolve those issues without trial. After submitting memoranda of law and replies thereto, the parties appeared for oral argument on August 8, 2005. Having considered the oral and written submissions of the parties, the Court now resolves the disputes as follows.

## I. *Background*

### A. Facts

Qestec, Inc. ("Qestec") is a Massachusetts corporation, William P. Moulin ("Moulin") is the President, a director and shareholder, and Joseph W. Lawrence ("Lawrence") is the Treasurer, a director and shareholder. Defendant, Michael Krummenacker ("Krummenacker"), is a shareholder, as well as a former employee and director.

On December 3, 1996, Qestec hired Krummenacker as a Sales Executive. The relationship developed and, on July 20, 1998, Krummenacker bought 25% of Qestec's stock (5,000 shares) for $25,000 and was made Vice President and a director of the company. At that time, Gregory Bitter also bought 25% of Qestec's stock and was made a director. As part of the transaction, Krummenacker and Bitter signed an amendment to a Cross Purchase Agreement ("the CPA") which outlined the responsibilities of the shareholders of Qes-

tec. The remaining issues concern the interpretation of the CPA.

During the mid–1990s Krummenacker began dating Audra Perkins ("Perkins") and the two were soon engaged. They were both employed at Qestec. In mid–1999, the relationship soured because he began to suspect (correctly) that she was seeing Robert Gorsett, another Qestec employee. An arbitration panel found that Krummenacker thereafter created an unpleasant work environment for Perkins. He repeatedly accessed her computer to read her personal information, tracked her movements and attempted to delay Gorsett's pending relocation to Massachusetts.

Moulin and Lawrence became aware of the distractions and, on May 23, 2000, suspended Krummenacker. On June 5, 2000, Moulin and Lawrence convened special shareholders and directors meetings. They voted to remove Krummenacker as a director and to terminate his employment.

Plaintiffs filed the instant action in state court on May 30, 2000 seeking, among other things, a declaratory judgment that Krummenacker is required to sell his Qestec stock to them pursuant to the CPA. The case was removed to this Court and Krummenacker filed counterclaims. Between 2001 and 2004, the case was submitted to arbitration in accordance with an agreement signed by the parties at the time Krummenacker was hired. On September 30, 2004, plaintiffs moved for summary judgment. The Court dismissed several claims and counterclaims and held that Krummenacker had been terminated "for cause" under the CPA.

On July 18, 2005, the parties informed the Court that most of the case had been settled and asked it to decide the remaining issues without need for a trial. On the same day, a teleconference was held and a briefing schedule was established. One week later, the parties filed a written Set-

tlement Agreement whereby two issues were put before the Court:

a. whether the company results from 1999 or from 2004 should be used to determine the valuation of defendant's stock under the CPA; and

b. whether the purchase price should be paid pursuant to Article VIII of the CPA (which allows for a five-year payout) or in a lump sum with back interest from the time of defendant's termination.

The parties filed briefs and replies and, on August 8, 2005, were heard at oral argument.[1]

## B. Relevant CPA Provisions

Article V of the CPA, entitled "Termination of Employment", provides that:

[i]n the event that a Shareholder's employment with the Corporation is terminated for "Cause" (as defined herein), the other Shareholder shall purchase, and the terminated Shareholder shall sell and deliver to the other Shareholder, all the shares in the Corporation owned by the terminated Shareholder, at the purchase price specified in Paragraph C of Article VII of this Agreement in accordance with the procedures and terms of Paragraph D of Article VIII of this Agreement.

Article VII, ¶ C states that:

[t]he purchase price of shares in the corporation to be purchase [sic] under Article V of this Agreement shall be eighty (80%) percent of the value determined under Paragraph B of this Article VII.

Article VII, ¶ B contains a formula for determining the "value" referred to in ¶ C

by reference to, among other things, the corporation's "book value ... as of the end of the last preceding complete fiscal year". Once the year is known, appropriate figures are plugged into a formula and the parties have agreed that if the year is 1999, the purchase price is $335,928 and if the year is 2004, the purchase price is $284,860.

Article VIII, ¶ D, which governs the logistics of the sale, states:

[t]he shareholder purchasing any shares in accordance with Article V of this Agreement shall pay to the selling Shareholder the amount necessary to purchase the shares of the selling Shareholder at the purchase price specified in Paragraph C Article VII of this Agreement. Said purchase price shall be due and payable not later than thirty (30) days from the date of determination of value of the shares to be purchased as determined under Paragraphs B and C of Article VII and shall be paid by the buying Shareholder, at his sole option, by (1) paying the entire purchase price in cash, or (2)(10%) percent of the purchase price in cash and the entire balance with a promissory note hereinafter described....

The promissory note shall bear interest at a variable rate equal to the lowest prime rate published in the Wall Street Journal, adjusted monthly, and payable in equal monthly installments of principal and interest with the first installment due (1) month from the date of delivery thereof and shall have a maturity of not more than five (5) years from the date of delivery thereof to the selling shareholder.

**1.** Krummenacker was represented by Attorney Louis Ciavarra who had been retained only one month earlier. The Court had urged the defendant for several years to retain counsel and both he and Attorney Ciavarra are commended, along with plaintiffs' counsel, for negotiating the settlement of most of the issues of this intractable case and for facilitating an efficient resolution to this protracted dispute.

Upon receipt of (1) the purchase price, in cash or in cash and promissory note, in payment for selling Shareholder's shares, and (2) the Non–Compete Agreement, the selling Shareholder shall execute and deliver to the other Shareholder such instruments as are necessary and proper to transfer the full and complete title to the shares.

## II. *Legal Analysis*

The August 8, 2005 hearing was unique because, while it resembled a dispositive motion hearing, no motions had been filed. Because no evidence was presented, the material facts are undisputed and the two referred issues involve contract construction, the Court will not enter findings of fact and conclusions of law as it would after a bench trial pursuant to Fed. R.Civ.P. 52(a). Rather, the Court will resolve the issues in accordance with the standard contained in Fed.R.Civ.P. 56 as if the parties had filed cross-motions for summary judgment.

In the parties' Settlement Agreement, they purport to put before the Court three issues, but, at oral argument, agreed that one "issue" was, in fact, a stipulation to be applied after resolution of one of the two actual disputes. Thus, the parties have presented two issues to the Court: 1) whether the payment amount should be determined using 1999 or 2004 financial figures and 2) whether the plaintiffs should be permitted to pay the purchase price over five years or be required to pay one lump sum together with pre-judgment interest.

### A. Proper Year for Calculation of Price

The first issue is whether the purchase price should be calculated using financial figures from 1999 or 2004. Article VII, ¶ B of the CPA, which governs calculation of the price to be paid for Krummenacker's shares, states that the stock value is to be calculated using the book value at "the end of the last preceding complete fiscal year".

Plaintiffs contend that the 2004 financial information should be used because, although Article V states that the sale is triggered when a shareholder's employment is terminated "for cause", the Court did not decide that the termination was "for cause" until April 13, 2005. They also point out that 1) it would have been impossible to determine the purchase price any earlier because it was specifically dependant upon whether the termination was for cause or not and 2) a tender of the purchase price during 2000 would have been futile given Krummenacker's adamant refusal to accept the legitimacy of his termination. Plaintiffs conclude that because a sale could not have taken place before 2005, 2004 financial figures should be utilized.

Krummenacker responds that 1999 financials should be used to determine the valuation of his stock because he was terminated in 2000 and, at that time, the plaintiffs "breached" their obligation to purchase his stock. He analogizes the situation to a breach of contract action: where a party breaches an agreement, damages accrue from the date of the breach, not from the date that a judgment is rendered. Thus, while Krummenacker concedes that a judicial decision on certain requisite elements of the sale did not take place until [2005], he points out that those "requisite elements" existed in 2000, and, notwithstanding the parties' five-year dispute, the sale should have occurred in 2000. He concludes that, for purposes of valuation, the clock stopped then.

The parties' disagreement is understandable because the CPA is ambiguous with respect the issue of which year is to

be used. Article VII, ¶ B states that the stock value is to be calculated using the book value at "the end of the last preceding complete fiscal year". "Preceding" is a relative term which should not stand alone, i.e. preceding what, the termination of employment or the actual sale? The drafters of the CPA understandably did not anticipate the situation where the termination of employment and the sale did not occur within the same fiscal year.

■ Although both parties' interpretations have merit, Krummenacker's is more persuasive. The sale of stock is triggered by Article V of the CPA which provides that a shareholder must sell his stock if he is terminated for cause. To determine the sale price, Article V refers to Article VII, ¶ B of which contains the crucial phrase that the stock is to be valued using figures from "the last preceding complete fiscal year". While that phrase could be read to mean that the controlling event is the actual sale (i.e. 2005), it is more plausibly construed to mean that the termination of the employee is the controlling event because the provision is triggered by the termination.

To the extent there is unresolvable ambiguity in the CPA, it is to be construed against the drafter. *Hubert v. Melrose–Wakefield Hosp. Ass'n,* 40 Mass.App.Ct. 172, 661 N.E.2d 1347, 1351 (1996). Here, Krummenacker was not a party to the original CPA and, therefore, could not have been the drafter. At the hearing, although plaintiffs' counsel was uncertain, he conceded that Moulin and Lawrence were probably the drafters and, in any event, were more responsible than the defendant. Thus, the phrase "last preceding complete fiscal year" will be construed to refer to the year preceding the termination of the employee, in this case 1999.

That construction is eminently appropriate in this case because the Court is persuaded that, had the drafters considered the possibility of a substantial delay between termination and sale, they would have chosen to value the stock as of the date of termination. The selling employee would have preferred such a valuation because, otherwise, he would be at the mercy of the remaining, rival shareholders pending valuation. Likewise, the buying shareholders would, no doubt, have favored a time-of-termination valuation because their natural assumption would have been that the company would increase in value over time. As such, they would have found it unacceptable for the terminated employee to share in anticipated appreciation by receiving a valuation based upon time of sale. Thus, for all of the described reasons, 1999 financial figures will be used and the purchase price will be $335,928.

### B. Payment Period and Interest

The remaining issue is whether the purchase price should be payable immediately or over five years in accordance with Article VIII, ¶ D of the CPA. A corollary issue concerns whether prejudgment interest is due for the past five years.

Plaintiffs argue that the CPA grants them the right to choose to pay over five years. Article VIII, ¶ D states:

> [the] purchase price shall be due and payable not later than thirty (30) days from the date of determination of value of the shares to be purchased as determined under Paragraphs B and C of Article VII and shall be paid by the buying Shareholder, at his sole option, by (1) paying the entire purchase price in cash, or (2)(10%) percent of the purchase price in cash and the entire balance with a promissory note....

The plaintiffs urge the Court to "interpret and enforce" that provision "exactly as written".

Defendant responds that the five-year payment provision was triggered on the date of his termination and, therefore, under the CPA, plaintiffs must now pay him the entire amount of the purchase price plus interest. He suggests that, even if the plaintiffs chose the five-year option, the period commenced in 2000 and that the prudent course for the plaintiffs would have been to pay the purchase price into escrow beginning at the time of termination because they knew an eventual sale was inevitable.

■ Plaintiffs have the better of this argument because the CPA unambiguously states that payment is not due until "thirty (30) days *from the date of determination of value of the shares* to be purchased" (emphasis supplied). Prior to the August 8, 2005 hearing, the value of the stock was undetermined and the 30–day period, therefore, will begin to run upon entry of this Memorandum and Order. Krummenacker is incorrect in stating that payment is due as of the date of termination because the CPA clearly sets forth a two-stage process: termination triggers calculation of the value of the stock, calculation of the value of the stock triggers the obligation to pay.

Of course, no one envisioned that the calculation of value would take five years but that peculiarity of this case is irrelevant because the CPA is clear: payment is due only after the value has been calculated. In the face of an unambiguous contractual provision, Krummenacker's equitable argument that, as a result of five years of litigation, full payment will, in effect, take 10 years to complete, is unavailing.

■ With respect to the issue of pre-judgment interest, because payment becomes due only after valuation has been completed, no interest has accrued. Krummenacker argues that failing to award him prejudgment interest is unfair

because it puts a terminated employee in the position of either a) foregoing a challenge to his termination or b) granting an interest-free loan to the other shareholders during litigation. That argument is not compelling, however, because the apparent Hobson's choice is the result of the parties' own making. The CPA could have been drafted (or amended) to require payment as of the time of termination but it was not. If future departing shareholders desire to avoid the supposedly inequitable result, they should negotiate an amendment to the CPA. The Court's commission is to enforce the existing agreement and, in this case, plaintiffs have the right to pay the stock purchase price over five years starting now.

### C. Non–Compete Agreement

Finally, plaintiffs argue that the Court should enforce a provision of the CPA requiring Krummenacker to execute a one-year non-compete agreement upon the sale of his stock. Defendant contends that the requirement has been waived because the parties made no reference to it in their Settlement Agreement.

■ Defendant is correct. In ¶ 3 of the Settlement Agreement, the parties agreed that:

Michael [Krummenacker] shall sell and transfer one half of his aforesaid Stock to Joseph [Lawrence] and one half of his aforesaid Stock to William [Moulin]. The transfer shall occur upon payment by cash and/or promissory note after the *determination of the purchase price by the Court* as set forth in paragraph 7, below.

(emphasis supplied). Paragraph 7 puts before the Court the issue of:

*[w]hether or not the purchase price shall be paid as set forth under Article VIII* of the [CPA] including payment over time of ten (10%) percent down and the balance over five (5) years....

**248**

(emphasis supplied). Thus, the subject issue that the parties put before this Court was the determination of the purchase price. The parties did not refer to this Court for adjudication all possible disputes under the CPA or, in fact, any dispute not referenced in the Settlement Agreement. To the contrary, both parties signed releases of all claims arising from the CPA other than those specifically referenced.

Non-compete clauses are enforceable only if they are reasonable and necessary to protect a legitimate business interest. *Boulanger v. Dunkin' Donuts Inc.*, 442 Mass. 635, 815 N.E.2d 572, 577 (2004). As such, the issue of whether to enforce a non-compete agreement in this case would be substantive and would not, as plaintiffs contend, be as simple as enforcing the CPA as written. Such an issue could have been preserved only by an explicit reference in the Settlement Agreement and, because it was not, the claim has been waived.

### ORDER

In accordance with the foregoing and with the parties Settlement Agreement, Krummenacker shall sell his Qestec stock to Moulin and Lawrence for $335,928, ten percent (10%) of which is to be paid within 30 days of the date of this Memorandum and Order and the balance over five (5) years pursuant to a promissory note to be executed and delivered within said 30 days, all in accordance with Article VIII, ¶ D of the Cross–Purchase Agreement. The subject shares shall be pledged by Moulin and Lawrence to secure the promissory note in accordance with Article VIII, ¶ E of the Cross–Purchase Agreement.

**So ordered.**